IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| UNITED STATES OF AMERICA, | Case No. 3:25-CR-300-KDB |
|---|---|
| *Plaintiff,* | |
| v. | EMERGENCY MOTION FOR A PROTECTIVE ORDER |
| DECARLOS DEJUAN BROWN, JR., | |
| *Defendant.* | |

Defendant Brown moves the Court, pursuant to Rule 16(d) of the Federal Rules of Criminal Procedure and the cited case law, for a protective order preventing the Charlotte-Mecklenburg Police Department from releasing or otherwise disclosing any audio or video related to this case to the media until further order of the Court.

WSOC Television, a Charlotte news station, has requested that the Mecklenburg Superior Court issue an order to release all body-worn camera (BWC) and 911 recordings from August 22, 2025, surrounding the death of I.Z. This case is a death-eligible case and has been the subject of intense media coverage. Releasing the evidence to the media at this stage of the proceedings will prejudice Mr. Brown's constitutional rights to due process and a fair trial.

Mr. Brown seeks this motion on an emergency basis because the state court ordered release of the recordings to WSOC on January 5, 2026, with temporary restrictions on further dissemination as outlined below.

I. **Current procedural posture**

Mr. Brown was charged in state court on August 23, 2025. On September 9, 2025, Mr. Brown also was charged by criminal complaint in federal court. The Complaint charged Mr. Brown with Terrorist Attack or Other Violence Against a Mass Transportation System, in violation of 18 U.S.C. § 1992(a)(7) and (b)(1). On October 22, 2025, Mr. Brown was Indicted by a federal grand jury with one count of Violence Against a Railroad Carrier and Mass Transportation System Resulting in Death in violation of 18 U.S.C. § 1992(a)(7), (b)(1), and (c)(1).

The charges in the complaint and indictment arose from the same set of facts as the state charges against Mr. Brown for first-degree murder. The federal indictment further provided notice of special findings under 18 U.S.C. §§ 3591 and 3592. Mr. Brown faces the death penalty if convicted in this Court. On December 11, 2025, Mr. Brown made his first appearance in federal court. He is now in the custody of the U.S. Marshals.

Mr. Brown only received the BWC in this case from the state prosecutors on December 19, 2025. There were approximately 42 recordings provided. None of the 911 calls have been produced in discovery as of today's date.

In October 2025, WSOC news moved for release of all body-worn camera (BWC) and 911 calls involving this incident. I.Z.'s family objected to release of the BWC and 911 calls to the media. They also filed their own request for the recordings to be released to the family.

The state court held a hearing on the motions on January 5, 2026. The court granted the family's motion for release of the recordings but restricted any release to a third-party.

At a subsequent hearing the same day on WSOC's motion, the parties stated their positions. I.Z.'s family withdrew its objection to release to the media but asked that if the recordings were released to the media, that the court also lift the restriction on the family from disclosing the recordings to a third-party.

Charlotte-Mecklenburg Police Department (CMPD) and the District Attorney's Office did not oppose release of the recordings, with certain conditions. CMPD proposed that the court release all of the recordings to WSOC, so they could then tailor their request to specific recordings and/or portions of recordings.

State defense counsel filed a motion, explaining that BWC are not public records under North Carolina law, N.C. Gen. Stat. § 132-1.4A(b). *See* attached exhibit. It is within the trial court's discretion to weigh the applicable standards under N.C. Gen. Stat. § 132-1.4A(g) "based on the facts of a particular case." *Id*. Counsel also argued that

the potential prejudice to Mr. Brown's constitutional rights to due process and a trial and case far outweigh any potential public interest in viewing the recordings at this preliminary stage of the criminal cases.

Federal defense counsel noted for the record that they agreed with state counsel's position. They also noted that Mr. Brown's case in federal court is now the primary jurisdiction for prosecution. And they advised the state court that they intended to file this motion asking for a federal protective order.

The state court expressed surprise at some of the parties' positions on WSOC's motion. After hearing arguments, it adopted CMPD's proposal that all recordings be released to WSOC. After viewing the recordings, WSOC can return to request the release of specific recordings or portions of recordings. The court cautioned that there would be "no disclosure whatsoever" of the recordings to third-parties.

This motion follows.

## ARGUMENT

The Court should issue a protective order on either of two independent grounds: (1) precedent from the Fourth Circuit and the Supreme Court require the Court to protect Mr. Brown's right to due process and a fair trial even if that requires preventing the media from obtaining evidence, and (2) North Carolina state law does not allow the release of these records.

**Federal Authority**

**I.  There is a substantial likelihood that the release of evidence to the media at this stage of the proceedings will irreparably harm Defendant's rights to due process and a fair trial.**

A jury verdict should be based on evidence presented in a courtroom, not outside sources. *Sheppard v. Maxwell,* 384 U.S. 333, 351 (1966). The Court should protect against even the probability of unfairness. *Id.* at 352 (citing *In re Murchison*, 349 U.S. 133, 136 (1955)). "Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts

must take strong measures to ensure that the balance is never weighed against the accused." *Id*. at 362.

The Supreme Court has long cautioned that "[p]ublicity concerning the proceedings at a pretrial hearing … could influence public opinion against a defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial." *Press-Enterprise Co. v. Superior Court of Cal. for Riverside Co.,* 478 U.S. 1, 14 (19860 (quoting *Gannett*, 443 U.S. at 378). As explained in more detail below, there are numerous issues with releasing evidence that has not been ruled admissible to the media. *Sheppard* explained in detail the "circus-like" atmosphere in that case that denied the defendant a fair trial. The Supreme Court was particularly concerned with the publication of witness statements and potential testimony regardless of whether those witnesses testified to the information. *Id*. at 359. It was also concerned with the release of investigative information that led to inaccurate and prejudicial reporting on the facts of the case. *Id*. Both concerns are present here and can be alleviated by a protective order.

In this case, the initial review of the body worn camera footage shows there are a number of witnesses interviewed[1] and statements by the Defendant. No court has ruled

---

[1] In North Carolina, the photographic/video evidence of the witness is "otherwise confidential or exempt from disclosure or release under State or federal law." N.C. Gen. Stat. § 132-1.4A(g)(2). N.C. Gen. Stat. § 15A-904(a2) and (a3) significantly limit disclosure of identifying information of witnesses to crimes and none of the exceptions include videos or photos of the witnesses.

Release also may harm the reputation or jeopardize the safety of a person—namely Mr. Brown, his family, local judges, the mayor, and the witnesses interviewed on camera. It goes without saying that this case is high-profile and has generated an unprecedented amount of media, and political, attention. Mr. Brown's family has reported receiving death threats. The mayor has also reported receiving threats, and it is rumored that several judges involved with Mr. Brown's previous criminal cases also have received threats. Social media is full of speculation as to why certain witnesses seemingly did not assist I.Z., as seen on released train video footage. Releasing the BWC of the incident at this early juncture in the case will only serve to further inflame the public such that the safety of Mr. Brown, his family, public political figures, and witnesses to the crime

on the admissibility of this information and defense counsel has not been in possession of the information long enough to evaluate any challenges to the evidence.[2] What's more, Mr. Brown has a constitutional right to present a defense, which necessarily includes conducting a robust pretrial investigation. *Washington v. Texas*, 388 U.S. 14, 19 (1967). Mr. Brown has not yet received discovery in this case. He only received the BWC at issue on December 19, 2025 and does not have the 911 calls. He has not had an opportunity to identify or locate the witnesses in the BWC or 911 calls, much less interview them. He does not have the police reports or other discovery that would be necessary to effectively investigate the information provided by the witnesses on the BWC and 911 calls.

In addition, Mr. Brown is in the midst of competency proceedings in both the state and federal courts. Any statements that he may have made on the BWC have not been evaluated for their inadmissibility, particularly in light of his mental state at the time of the crime and at the time of any potential statements. Release of the recordings now would be detrimental to not only his ability to investigate his case but also to develop and present a defense. *See* U.S. Const. amend. V; *Miranda v. Arizona*, 384 U.S. 436 (1966). In short, release of the recordings to the media at this stage of the prosecution could influence any potential jury members and disclose information that the courts may otherwise deem admissible at a later date.

The Supreme Court has cautioned that while the First Amendment is undoubtedly a compelling public interest, a defendant's rights to due process and a fair trial supersede those to the public's right to access. *See Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 378 (1979). This is so, because "adverse publicity can endanger the ability

---

would be at risk. And these concerns further implicate Mr. Brown's rights to a fair trial and due process.

[2] There has been no discovery provided in the federal case against Mr. Brown. All information obtained by defense counsel has come from the state prosecution, but even that production is just a fraction of the investigative materials counsel expects to receive in this case.

of a defendant to receive a fair trial." *E.g., Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Irvin v. Dowd,* 366 U.S. 717 (1961); *Marshall v. United States*, 360 U.S. 310 (1959). *Cf. Estes v. Texas*, 381 U.S. 532 (1965). Indeed, "[t]he news media's access to the courtroom is subordinate to the defendant's right to a fair trial." *Dickinson Newspapers, Inc. v. Jorgensen*, 338 N.W.2d 72, 79 (N.D. 1983) (citing *Estes*, 381 U.S. 532 and *Sheppard*, 384 U.S. 333); *Palm Beach Newspapers, Inc. et al. v. Burk*, 504 So.2d 378, 380 (Fla. 1987) ("where a defendant's right to a fair trial conflicts with the public's right of access, it is the right of access which must yield."); *State v. Arguelles*, 63 P.3d 731, 757 (Utah 2003) ("A court may restrict media access altogether where necessary to assure that the defendant receives a fair trial ....")

To be clear, the defense is not asking the Court to bar access to any court proceedings. It is simply asking that it have an opportunity to thoroughly review evidence prior to the media receiving that evidence and publishing it to the potential jurors in this matter. The Supreme Court considered the sealing of a suppression hearing and noted the particular concern with allowing access to potentially inadmissible evidence:

> Publicity concerning pretrial suppression hearings such as the one involved in the present case poses special risks of unfairness. The whole purpose of such hearings is to screen out unreliable or illegally obtained evidence and insure that this evidence does not become known to the jury. Cf. *Jackson* v. *Denno*, 378 U.S. 368. Publicity concerning the proceedings at a pretrial hearing, however, could influence public opinion against a defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial. 443 U.S., at 378.

*Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 14 (1986).

Those concerns are present here, for the reasons noted above. If the media is allowed access to this footage, a problem will arise identical to the one that ultimately led to the reversal of the conviction in *Sheppard*. The press will be able to report information directly related to this case but outside the confines of the courtroom. As in

*Sheppard*, the due process violations from inadmissible or prejudicial evidence being released to the public will put any future proceedings at risk.

For these reasons, Mr. Brown moves this Court for a protective order preventing the Charlotte-Mecklenburg Police Department from releasing or otherwise disclosing any audio or video related to this case to the media until further order of the Court.[3]

Respectfully Submitted,

***s/ Joshua Snow Kendrick***
Joshua Snow Kendrick (9037)
KENDRICK & LEONARD, P.C.
7 Mills Avenue (29605)
P.O. Box 6938
Greenville, SC 29606
Tel: (864) 760-4000
Josh@KendrickLeonard.com

***/s/ Megan C. Hoffman***
Megan C. Hoffman
First Assistant Federal Public Defender
Federal Public Defender, WDNC
129 W. Trade St., Ste. 300
Charlotte, NC 28202
(704) 374-0720
megan_hoffman@fd.org

Attorneys for DeCarlos Brown, Jr.

---

[3] It is Mr. Brown's understanding that the recordings have already been released to I.Z.'s family but they are bound by a protective order not to release the recordings to any third-party. Because the family asked for release from the protective order if the recordings are released to the media, Mr. Brown asks that this Court include the family in its protective order.